CASE No. 1165.

MOODY v. TEDDER.

1. Testator by his will devised and bequeathed to his wife "during the term of her natural life only, all my property both real and personal, authorizing and empowering her to use and dispose of so much thereof as may be necessary for her comfortable support and maintenance in such style and manner as she may see fit and proper;" and after her death, he gave "whatever portion may be remaining of my said property to J., her heirs

and assigns forever." *Held*, that the widow, as life-tenant, having an abso-
lute power of disposal, could not be held accountable as trustee to the
remainderman, for three slaves sold to pay the debts of the widow, to run
the plantation and to support herself and agent.

2. The widow, in consideration that T., the husband of J., assumed the pay-
   ment of her debts and covenanted to support and maintain her through
   life, conveyed to T. all her *interest* and life-estate in this property, and he
   it was who sold the slaves for the purposes mentioned. *Held*, that the
   deed carried to T. not only the life-estate, but also the power of disposal,
   and must be referred to her power whether it purported to be an execution
   or not; and T. was not accountable to the remaindermen, children of J.,
   after the widow's death, for the purchase-money of the slaves so sold.

3. The deed, accompanied by the widow's acquiescence for fourteen years,
   could, at least, be construed as a power of attorney, authorizing T. to make
   the sale.

4. But, under this will, the remaindermen had no right to the slaves so sold,
   as neither they nor the purchase-money were property of the widow
   *remaining* at the time of her death. 1. Because they were sold for purposes
   within the scope of the power and their price so expended; and, 2. Be-
   cause the slaves were emancipated before the widow's death.

SIMPSON, C. J., concurred only upon the last ground stated.

Before WALLACE, J., Darlington, October, 1881.

The case is fully stated in the opinion of this court. The will
is very short and contains only what is copied into the opinion.

*Messrs. Boyd & Nettles*, for appellants.

*Mr. G. W. Dargan*, contra.

March 11th, 1882. The opinion of the court was deliv-
ered by

McGOWAN, A. J. William Griggs, late of Darlington county,
died in the year 1850, leaving a widow, Mary, but no children.
At the time of his death he was seized and possessed of his
homestead tract of land, containing five or six hundred acres,
twenty-seven negro slaves, horses, hogs and other personal
property. He left a will by which he devised and bequeathed
to his " widow, Mary, during the term of her natural life only,

all his property, both real and personal, authorizing and empowering her to use and dispose of so much thereof as may be necessary for her comfortable support and maintenance in such style and manner as she may see fit;" and, secondly, after the death of his said wife, Mary Griggs, he gave " whatever portion may be remaining of his said property to Jemima Tedder (wife of William Tedder), to her, her heirs and assigns forever."

Mrs. Griggs qualified as sole executrix of the will, and continued to reside on the homestead and manage the property. She became embarrassed, and in order to pay the debts and prevent the sale of a negro, which had been levied upon by the sheriff, and doubtless to place the property under the control of one who could manage it, on April 22d, 1856, she executed to William Tedder, the husband of the devisee in remainder, the following deed : " Whereas, William Tedder having this day executed to me an obligation, in writing, to pay all my just debts, as well as the debts, if any, against the estate of William Griggs, deceased, and to give me a respectable maintenance and support for and during my natural life; now, I, the said Mary Griggs, for and in consideration of the obligation above named, and of the sum of one dollar to me paid, have granted, bargained, transferred and delivered, and by these presents do grant, bargain, transfer and deliver unto the said William Tedder *all my interest and life-estate* in and to all and singular the lands, negroes, horses, cattle, hogs and other property left to me for life by the last will and testament of William Griggs, deceased, together with all the debts due me or the estate of William Griggs aforesaid for negro hire, &c., together with all and singular the rights, members, hereditaments and appurtenances to the said land or other property belonging or in any wise incident or appertaining ; to have and to hold all and singular the land or other property named unto the said William Tedder, his heirs and assigns forever. And I do hereby quit claim to the same in behalf of myself and my heirs forever," &c.

Under this deed, William Tedder took possession of the property, leaving Mrs. Griggs in possession of the dwelling-house and household and kitchen furniture. The property at that time was in bad condition. There was a lack of provisions and the

work animals consisted of four worn-out horses, two of them blind. The debts amounted to $1,500, and it was necessary to restock the farm. Tedder managed the property skillfully, made good crops and improved the place up to the end of the war, when the slaves were emancipated. In 1859 he sold three negroes (one of them being unmanageable) for $2,700 and used the money in paying off the debts which he had assumed ($1,500), to run the plantation and to support his aunt, Mrs. Griggs, himself and family. When the slaves were emancipated they had increased to thirty-two, exclusive of the three sold. After the war the property depreciated mainly through theft, and at the death of Mrs. Griggs some of the personal property remained, which had been delivered to Tedder.

In 1864, Jemima Tedder died, and her interest in the estate descended to her heirs—her husband, William, to the extent of one-third, and the remainder in equal shares to her seven children, of whom the plaintiff, Mahalie Moody, is one. Mrs. Mary Griggs was supported until she died in 1873, after which time all the children were allowed to cultivate the land, Tedder cultivating about one-third. As they grew up they continued to hire out the place, planting such of the land as they wished. Plaintiff, Mahalie Moody, and husband, went on the land in 1875, and instituted this proceeding against her father and brothers and sisters in May, 1879, for partition of the land *and for an account of the rents and profits, and personal property which went into the possession of William Tedder, under the deed of April,* 1856. Before trial it was conceded that the heirs of Jemima were entitled to partition of the land, and the plaintiffs abandoned all claim for account, *except for the value of the three negro slaves sold by William Tedder in* 1859. That point was referred to J. J. Wood, Esq., as special referee, who held that William Tedder was *not* liable to account for the $2,700, the price of the slaves sold. The case came up, on exceptions to this report, before Judge Wallace, who held that William Tedder *was* liable for the value of the negroes sold. From this judgment William Tedder appeals to this court upon the following exceptions:

"1. That the deed of Mary Griggs invested William Tedder with the right to dispose absolutely of the negroes, or at least to

dispose of them in the interest of the plantation and for the maintenance of Mary Griggs.

"2. That under the will of William Griggs the plaintiff or remainderman had title only to such of the property as might remain at the death of Mrs. Griggs, and as the three negroes sold did not exist as property at that time they have no right to account for their value.

"3. The circumstances under which and the purposes for which the negroes were sold and the purchase-money applied, justified the sale, and relieved William Tedder from liability for the purchase-money.

"4. The sale being in the interest and for the benefit of the life-estate, William Tedder is not liable for the same."

This case, like that of *Finley* v. *Hunter*, 3 *Strobh. Eq.* 84, must be determined upon the strong phraseology of the testator's will and a manifest intention appearing from the terms he has employed in the gift to his wife for life and the limitation over. It seems that the testator was childless, and naturally his wife was the first object of his bounty. He desired to make her comfortable for the remainder of her days if it took the whole of his estate to do it, as is shown by the gift to her of the whole property for life, " *authorizing and empowering her to use and dispose of so much thereof as may be necessary for her comfortable support and maintenance in such style and manner as she may see fit and proper."* This was practically an absolute power of disposal, for while it is true that the will indicates the purpose for which it was given and for which alone the power could be exercised, yet *in extent* it was unlimited, as the widow was made the sole judge of the " style and manner " of her living, and necessarily of the amount which would. be required to support it.

Being a lady unaccustomed to business she had the right, at least, to employ some one to look after the property for her. There can be no doubt that Mrs. Griggs had the power to dispose of any portion of the estate for the purpose indicated, and if she had sold the three negroes which were sold by Tedder and applied the funds precisely as he applied them, in paying off the debts, restocking the farm, and in supporting herself and the family of Tedder while he was attending to her business, there could not

have been a shadow of claim for accountability upon her. "Powers may be general or limited. In a limited power, the limitations contained in it constitute the rule by which it is to be executed. In the execution of a general power there can be no rule but the discretion of the party to whom it is confided." *Fronty* v. *Fronty, Bail. Eq.* 529.

We are, therefore, relieved from considering the embarrassing questions which arise out of the relation of technical tenant for life and remainderman. As we understand it, a tenant for life is one who is entitled to the use of property which, at his death, goes over to some one else. The property may consist of particular articles described or of many in one, as a flock of sheep, or a gang of negroes, or a plantation stocked for farming purposes. In each of these classes there is a certain rule of accountability, not always the same, but in all the underlying principle is that *it is the property itself* that the remainderman is entitled to receive; and as the tenant, while in the use, may have abused or destroyed the property, in that regard he is considered a trustee for the remainderman.

There is no foundation in this case for such relation. The most ample power of disposal was given to the first taker, and the second taker was expressly restricted to what property "*remained after the death of Mrs. Griggs.*" No such relation as that of trustee and *cestui que trust* in the usual form existed between Mrs. Griggs and Jemima Tedder. It is clear the testator did not intend to make his wife accountable to her niece either for extravagance in the manner of her living, or for want of business habits and economy, or generally for the manner in which she used the property while in her possession. His wife was the first object of his affections, and she was to be made comfortable out of his property if nothing remained of it at her death.

But, conceding as an abstract proposition, that such would have been the result if Mrs. Griggs had retained possession and sold the negroes herself in execution of the power, it is contended that Tedder cannot claim such exemption from accountability, for the reason that the deed from Mrs. Griggs to him was not the execution of her power of disposal, but simply the conveyance of a

naked life-estate, and being thus constituted tenant for life without the powers, he falls under the principles applicable in such cases, and, as a consequence, must account for the purchase-money of the slaves sold by him. That is to say, that, although Tedder assumed the responsibility of paying the debts and supporting Mrs. Griggs for life, yet to enable him to do so, no means were conveyed to him except the bare use of the property in its dilapidated condition, with responsibility over to Jemima or her heirs as technical tenant of property belonging to them in remainder.

The first observation suggested by this view is that no life-estate pure and simple was created by this will, and if Tedder held such a position it must have been not under *the will* of Mr. Griggs, but under *the deed* of Mrs. Griggs. In such a state of facts, could the plaintiffs, who claim exclusively under the will of Mr. Griggs, go against Tedder in respect to this alleged life-estate? What privity was there between them? But passing over this point let us see what was conveyed to Tedder under the deed of Mrs. Griggs. She had a life-estate in the property and coupled with it an unlimited power of disposal for certain purposes; she found herself unable to manage the property, and in consideration of the payment of the debts and her support she conveyed "*all her interest* and life-estate in the property to William Tedder, his heirs and assigns forever." Did she mean to convey a bare life-estate or all her rights in the estate, including her power of disposal? A large amount of debt was pressing, some of it in judgment, and a negro hired. Present relief was the object of the arrangement, and the conveyance simply of a life-estate would not have accomplished the purpose. We cannot suppose that at the moment when her need was the greatest she intended to relinquish altogether her power, or to separate the power from the life-estate—conveying the latter and still retaining the former. We think her intention was, in consideration of the payment of the debts and her support, to put Tedder precisely in her place, with all her rights in respect to the property, *including the power of disposal.*

Did the deed effect that intention? The words are "*all my interest and life-estate.*" No reference in terms is made to the power of disposing, but besides the life-estate she had no other

"interest" in the property, and there is express reference to the property as to which the power existed "in and to all and singular the land, negroes, &c., left to me for life by the last will and testament of William Griggs, deceased." It may be true that the word "interest" was not the technical term to express the idea of a power, but in the ordinary acceptation of the word it was broad enough to cover it; and we think the deed was intended to include the power. The question of the execution of a power is always one of intention, "and if the devisee of the power intends to execute it, that intention, however manifested, whether directly or indirectly, positively or by just implication, will make the execution valid and operative. I agree that the intention to execute the power must be apparent and clear, so that the transaction is not fairly susceptible of any other interpretation." *Bilderback* v. *Boyce*, 14 *S. C.* 540.

Assuming this to be the proper construction of the deed, and considering the nature of the power, we incline to think that it conveyed *the whole interest in the estate*, subject to the rights of the remainderman, somewhat in analogy to the remarkable case of *McAllister* v. *Tate*, 11 *Rich.* 510, in which it was held that a devise in the words "in fee-simple for life" carried the absolute estate. So considered, the deed of Mrs. Griggs, according to well-established principles, must be referred to her power of appointment, and not to her life-estate. "When a man has a power and an interest, and he creates an estate which will not have an effectual continuance in point of time, if it be fed out of his interest, it shall take effect by force of the power. As where a tenant for life, with the power to borrow money, granted a rent charge generally as a fund for the payment of the debt, it was deemed an execution of the power, and not a grant out of his interest." 1 *Sugd. Pow.* 419.

It is insisted, however, that the deed as to all interest beyond the life-estate was ineffectual, for the reason that it did not purport to be the execution of a power, but the transfer of the power itself, which could not from its nature be delegated. It may be that the deed could not pass *the power as property*, so as, in respect to its execution, to substitute Tedder for Mrs. Griggs. We have seen that the deed may be construed to pass the absolute

estate, subject to the rights of the remainderman, and in that view must be referred to the power, whether it purported to be an execution or not.

But, if we are mistaken in that, we see no great difficulty in construing the deed as *a power of attorney,* authorizing Tedder to execute the power for and in behalf of Mrs. Griggs. A power may be executed by attorney when it is not of such a character as *to impose a personal confidence in the devisee of it to exercise his judgment.* At the time the deed to Tedder was executed there was no *confidence or option* involved in the matter. The debts and the support of Mrs. Griggs were certain and fixed, had to to be provided for, and were referred to in the deed as the very object of its execution. She was not limited to any particular mode of execution, and, having the right herself to provide for them, she could *appoint another to do it for her.* Tedder's act in selling the negroes was the act of Mrs. Griggs through him, and this receives confirmation from her silent acquiescence from 1859 until 1873, when she died.

"It is frequently contended in practice that a devisee of a power cannot execute a deed of appointment *by attorney.* But the cases by no means authorize this position. They merely establish that the devisee cannot delegate *the confidence and discretion* reposed in him to another. There the devisee points out the precise appointment which he is desirous should be made; there no confidence, no discretion is delegated. The appointment is in every respect an exercise of his own judgment, and there cannot be any reason why he should not be permitted to execute the *deed* of appointment by attorney. The contrary doctrine would lead to great inconvenience. Where, however, a particular mode of execution is required, it would be difficult to support an execution by attorney." 1 *Sugd. Pow.* 215.

There is still another view of this case. The plaintiffs claim, through Jemima Tedder, under the will of William Griggs, and it would seem that they should be limited to what the will gives them. The second clause of the will is in these words : "*After* the death of my said wife, Mary Griggs, I give, decree and be- queath *whatever portion may be remaining* of my said property to Jemima Tedder (wife of William Tedder), to her, her heirs and

assigns forever." The three negroes sold in 1859 were no part of the estate "remaining" in 1873, at the death of Mrs. Griggs, for two reasons, *first,* that they had been sold during the life of Mrs. Griggs by her authority, and the proceeds of sale applied to the payment of the debts and to the support of her and the family of the said Jemima, including the plaintiff, Mahalie. We see nothing to show that the sale of the negroes was unnecessary, or that the proceeds were not applied as indicated. The plantation, under the control of a widow without business habits, had run down and needed restocking. The debts to be paid amounted to $1,500, and it probably required the whole $2,700 to pay the debts, employ an overseer and refit and begin again ; all of which was within the scope of the power in the will. *Second.* If the negroes had not been sold they could not have constituted any part of the property "remaining" at the death of Mrs. Griggs, for the reason that before that time they had been emancipated and ceased to be property. We do not mean to say that in certain cases the proceeds of property may not be pursued instead of the property itself, but that, under the peculiar provisions of this will, neither the property nor its proceeds can be considered as "remaining" at the death of Mrs. Griggs.

The judgment of this court is that the judgment of the Circuit Court be reversed so far as it required William Tedder to account for the proceeds of the three negroes sold by him, and affirmed in all other respects.

McIVER, A. J., concurred.

SIMPSON, C. J., concurred in the judgment of the court in this case on the last ground stated in the opinion pronounced by Mr. Justice McGowan, to wit, the emancipation of the negroes before the falling in of the life-estate.